## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **MIDWEST ORTHODONTIC ASSOCIATES, LTD, on behalf of itself and all others similarly situated,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | No.  3:20-cv-01167-GCS |
| **vs.** | ) ) | |
| **THE CINCINNATI CASUALTY COMPANY, INC. and THE CINCINNATI INSURANCE COMPANY,** | ) ) ) ) ) | |
| **Defendants.** | ) | |

### <u>MEMORANDUM & ORDER</u>

**SISON, Magistrate Judge:**

#### INTRODUCTION AND BACKGROUND

Plaintiff, Midwest Orthodontic Associates, LTD, conducts a dental practice limited to orthodontic services and treatments in Peoria and Washington, Illinois. (Doc. 1-1, ¶¶ 1, 13). On March 20, 2020, Governor Pritzker issued his first stay-at-home order for Illinois. *Id.* at ¶ 41. Plaintiff also received various guidance directives from the American Dental Association ("ADA"), Illinois State Dental Society ("ISDA"), Centers for Disease Control ("CDC"), and the Illinois Department of Public Health ("IDPH"). *Id.* at ¶¶ 6-8. *See also Id.* at ¶¶ 31-47. As such, beginning on March 20, 2020, and continuing for approximately six weeks thereafter, Plaintiff shut down its practice, resulting in a substantial loss of revenue. *Id.* at ¶ 8.

On or about September 3, 2020, Plaintiff, on behalf of itself and all others similarly situated, filed a nine count Class Action Complaint in the Circuit Court of Madison County, Illinois, against Defendants, The Cincinnati Casualty Company, Inc. and The Cincinnati Insurance Company. (Doc. 1, ¶ 2). The Defendants removed the matter to this Court on diversity jurisdiction grounds on November 4, 2020. (Doc. 1). In its complaint, Plaintiff seeks relief related to Defendants' denial of Plaintiff's insurance claim for alleged business damages sustained during the COVID-19 pandemic. (Doc. 1-1). Plaintiff also seeks an order certifying appropriate classes and/or subclasses; designating Plaintiff as the class representative and his counsel as class counsel; a declaration determining the meaning of the Business Income, Extra Expense, and Civil Authority coverage provisions; and awarding damages, as appropriate. *Id.* Plaintiff further asserts claims for breach of contract for failing to provide coverage. *Id*. *Id.* It finally requests damages and attorneys' fees for vexatious and unreasonable conduct under 215 ILL. COMP. STAT. § 5/155. *Id.*

Now before the Court is Defendants' Motion to Dismiss, which Defendants filed on November 12, 2020. (Doc. 7, 8). Plaintiff filed a response in opposition on January 8, 2021. (Doc. 28). Defendant filed a reply in support on January 22, 2021. (Doc. 29). During the pendency of this motion, both parties filed a number of supplementary authorities. (Doc. 35, 36, 39, 43, 46, 51, 52, 55, 60). Having reviewed the briefing, arguments, and supplementary authorities, the Defendants' Motion to Dismiss (Doc. 7) is **GRANTED** for the reasons set forth below.

## FACTUAL ALLEGATIONS AND PERTINENT POLICY PROVISIONS

During the time period that Plaintiff shut down its practice, it only saw a

"handful" of patients for urgent problems. (Doc. 1-1, ¶¶ 8, 49). From May through June 30, 2020, Plaintiff's practice was limited to seeing 50% of its usual number of patients. *Id.* at ¶ 49. This was due to the need for adhering to social distancing requirements because of COVID-19. *Id.* Plaintiff argues that the losses incurred during the shutdown are covered under an insurance policy issued by Defendant for the period of August 7, 2018 to August 7, 2021. Id. at ¶ 59. Plaintiff contends that coverage exists under the policy's Business Income and Extra Expenses coverage and Civil Authority coverage provisions. *Id.* at ¶¶ 61-74.

The relevant policy provisions upon which Plaintiff relies can be found in the Building and Personal Property Coverage Form (Including Special Causes of Loss). (Doc. 1-1, p. 68-107). The policy's general coverage provision states that Defendants "will pay for direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." (Doc. 1-1, p. 70). The term "Covered Cause of Loss," which is used in the Business Income, Extra Expense and Civil Authority sections set forth below, is defined as "direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part." (Doc. 1-1, p. 72). "Loss" is further defined as "accidental physical loss or accidental physical damage." (Doc. 1-1, p. 105).

The Business Income section of the Building and Personal Property Coverage Form states, in pertinent part:

> We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered

Cause of Loss.

(Doc. 1-1, p. 85-86).

The Extra Expense coverage section of the Building and Personal Property

Coverage Form provides in pertinent part as follows:

(a)     We will pay Extra Expense you sustain during the "period of restoration." Extra Expense means necessary expenses you sustain . . . during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

(b)     If these expenses reduce the otherwise payable "Business Income" "loss," we will pay expenses . . . to:

   1)     Avoid or minimize the "suspension" of business and to continue "operations" either:

      a)     At the "premises;" or

      b)     At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or

   2)     Minimize the "suspension" of business if you cannot continue "operations."

(c)     We will also pay expenses to:

   1)     Repair or replace property; or

   2)     Research, replace or restore the lost information on damaged "valuable papers and records;"

but only to the extent this payment reduces the otherwise payable "Business Income" "loss," if any property obtained for temporary use during the "period of restoration" remains after the resumption of normal "operations," the amount we will pay under this Coverage will be reduced by the salvage value of that property . . .

. . .

(Doc. 1-1, p. 86).

The Building and Personal Property Coverage Form also provides for Civil Authority coverage and states:

> When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises" provided that both of the following apply:
>
> (a)    Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and
>
> (b)    The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage. . . .

 (Doc. 1-1, p. 86).

Business Income, Extra Expense and Civil Authority provisions are also found in the Business Income (And Extra Expense) Coverage Form. (Doc. 1-1, p. 138-146). The Business Income section is generally the same, except for the omission of "Rental Value." The section states:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at a "premises" which is described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The "loss" must be caused by or result from a Covered Cause of Loss.

(Doc. 1-1, p. 138).

The Extra Expense section is also generally the same, but with some minor variations. The section provides as follows:

(a)     Extra Expense Coverage is provided at the "premises" described in the Declarations only if the Declarations show that "Business Income" coverage applies at that "premises."

(b)     Extra Expense means necessary expenses you sustain (as described in Paragraphs 2.c., d. and e.) during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

(c)     If these expenses reduce the otherwise payable "Business Income" "loss," we will pay expenses . . . to:

    1)     Avoid or minimize the "suspension" of business and to continue "operations" either:

        a)     At the "premises;" or

        b)     At replacement "premises" or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location; or

    2)     Minimize the "suspension" of business if you cannot continue "operations."

(d)     We will also pay expenses to:

    1)     Repair or replace property; or

    2)     Research, replace or restore the lost information on damaged "valuable papers and records;"

but only to the extent this payment reduces the otherwise payable "Business Income" loss. If any property obtained for temporary use during the "period of restoration" remains after the resumption of normal "operations," the amount we will pay under this Coverage will be reduced by the salvage value of that property . . .

. . .

(Doc. 1-1, p. 138-139).

The coverage provided for in the Civil Authority is essentially the same. (Doc. 1-

1, p. 139). As for the term "Covered Cause of Loss," the Business Income (And Extra Expense) Coverage Form refers back to the definition contained in the Building and Personal Property Coverage Form. *Id.* Finally, the definition of "Loss" is the same. *Id.* at p. 146.

## LEGAL STANDARDS

"The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive dismissal, Plaintiff must state a claim that is 'plausible on its face.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). A plausible claim exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). However, the plaintiff's allegations of fact must rise above a speculative level in order to constitute a "showing" that makes the claims in a complaint rise to the level of plausibility. *Bell Atlantic Corp.*, 550 U.S. at 555 (internal citations omitted).

The Court will accept all well-pleaded factual allegations as true and will construe all reasonable inferences in Plaintiff's favor. *See Gibson*, 910 F.2d 1510 at 1520-21; *Zablocki v. Merchants Credit Guide Co.*, 968 F.3d 620, 623 (7th Cir. 2020). "Well-pleaded facts," however, include neither legal conclusions nor unsupported conclusions of fact. *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002) (internal citations omitted). *See also Iqbal*, 556 U.S. at 679 (stating the Court is not required to accept the allegations of "a plaintiff armed with nothing more than conclusions."); *Zablocki*, 968 F.3d at 623 (noting that the Court

need not accept statements of law or unsupported conclusory factual allegations as true).

Finally, when a plaintiff "relies on a document attached to the complaint, and does not

deny its accuracy, the facts communicated by that document control over allegations to

the contrary." *Zablocki*, 968 F.3d at 623.

DISCUSSION

### I.     Scope of Coverage

The interpretation of an insurance policy is a matter of state law. *See Windridge of

Naperville Condominium Assoc. v. Philadelphia Indemnity Ins. Co.*, 932 F.3d 1035, 1039 (7th

Cir. 2019). The parties agree that Illinois law controls this dispute. In Illinois, the proper

construction of an insurance policy is a legal question, and the Court's primary objective

is to ascertain and give effect to the intentions of the parties as expressed in the policy.

*See Windridge*, 932 F.3d at 1039 (citing *Hobbs v. Hartford Ins. Co. of the Midwest*, 214 Ill.2d

11, 823 N.E.2d 561, 291 Ill. Dec. 269 (Ill. 2005)). To ascertain the meaning of the policy's

language, the Court "must construe the policy as a whole and 'take into account the type

of insurance purchased, the nature of the risks involved, and the overall purpose of the

contract.'" *Windridge*, 932 F.3d at 1039 (citing *Traveler's Ins. Co. v. Eljer Mfg.*, 197 Ill. 2d 278,

757 N.E.2d 481, 258 Ill. Dec. 792 (Ill. 2001)). If the policy language is unambiguous, it will

be applied as written, unless it contravenes public policy. *See Windridge*, 932 F.3d at 1039;

*Founders Ins. Co. v. Munoz*, 237 Ill. 2d 424, 930 N.E.2d 999, 341 Ill. Dec. 485, 490 (Ill. 2010).

Policy provisions, however, are not ambiguous solely because the parties disagree about

its interpretations; rather, an ambiguity exists when the policy language is "subject to

more than one reasonable interpretation." *Windridge*, 932 F.3d at 1039; *Founders*, 341 Ill.

Dec. at 490.

When interpreting state law, a federal court must determine how the state's highest court would rule. *See Rodas v. Seidlin*, 656 F.3d 610, 626 (7th Cir. 2011). If the state's supreme court has not yet addressed the issue, the federal court should "consult and follow the decisions of intermediate appellate courts" to predict how the supreme court would act, unless "there is convincing reason to predict the state's highest court would disagree." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012). Absent any authority from the relevant state courts, the federal court must examine the reasoning of courts in other jurisdictions addressing the same issue. *See In re Zimmer, NextGen Knee Implant Products Liability Litigation*, 884 F.3d 746, 751 (7th Cir. 2018)(citing *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007)).

### A.    Direct Physical Loss under the Business Income and Extra Expense Coverage Provisions.

The concept of "direct loss" is critical to Plaintiff's coverage argument under the Business Income and Extra Expense Coverage provisions. Under the Business Income provision, the Defendant will pay for lost business income resulting from the suspension of operations if such a suspension is "caused by direct 'loss' to a property at a 'premises' . . . ." (Doc. 1-1, p. 85). The Extra Expense provision likewise relies on this "direct loss" concept as it provides for expenses sustained during a "period of restoration" that "would not have [been] sustained if there had been no direct 'loss' to property . . . ." (Doc. 1-1, p. 86). The phrase "direct loss" is not defined in the policy. However, the term "loss" is defined as "accidental physical loss or accidental physical damage." (Doc. 1-1, p. 105).

Thus, the plain and ordinary meaning of "direct loss" is central to whether Plaintiff's Class Action Complaint survives Defendants' Motion to Dismiss.

Defendants argue that Plaintiff cannot allege that Covid-19, guidance and directives from the CDC, ADA, ISDA, and IDPH, and/or the Governor's executive orders caused "direct physical loss" to its property. Defendants maintain that this language unambiguously requires some form of actual "tangible loss" or a "physical alteration" to the structure of Plaintiff's property. Defendants reason that the policy only indemnifies against loss or damage to *property*. Because an infectious disease like COVID-19 only damages *people*, it cannot cause the requisite physical or material damage necessary to trigger coverage. Thus, because Plaintiff has not alleged that its property structure was physically altered by COVID-19, coverage is unavailable, and the complaint must be dismissed.

In support, Defendant relies on *Sandy Point Dental, PC v. The Cincinnati Ins. Co.*, 488 F. Supp. 3d 690 (N.D. Ill. 2020).  In *Sandy Point*, the court interpreted similar language and concluded that there was no coverage because COVID-19 did not "physically alter the appearance, shape, color, structure, or other material dimension of the property." *Id.* at 694. The vast majority of federal courts to have considered the issue have denied coverage. This includes most federal district courts in Illinois,[1] as well as one circuit court

---

[1]      *See T&E Chicago LLC v. The Cincinnati Ins. Co.*, No. 20 C 4001, 2020 WL 6801845 (N.D. Ill. Nov. 19, 2020); *Bradley Hotel Corp. v. Aspen Specialty Ins. Co.*, No. 20 C 4249, 2020 WL 7889047, at *1 (N.D. Ill. Dec. 22, 2020); *TJBC, Inc. v. The Cincinnati Ins. Co.*, No. 20-cv-815-DWD (N.D. Ill. Jan. 25, 2021); *The Bend Hotel Develop. Co., LLC v. The Cincinnati Ins. Co.*, 515 F. Supp. 3d 854 (N.D. Ill. 2021); *Crescent Plaza Hotel Owner v. Zurich Am. Ins. Co.*, No. 20 C 3463, 2021 WL 633356 (N.D. Ill. Feb. 18, 2021); *Smeez, Inc. v. Badger Mutual Ins. Co.*, No. 20-cv-01132-DWD, 2021 WL 3476402 (S.D. Ill. Mar. 22, 2021); *Zajas, Inc. v. Badger Mutual Ins. Co.*, No. 20-cv-1055-DWD, 2021 WL 1102403 (S.D. Ill. March 23, 2021); *Chief of Staff LLC v. Hiscox Ins. Co. Inc.*,

of appeals.[2]

Plaintiff, on the other hand, asserts that the policy language contemplates losses from any "deprivation" of the property. Specifically, Plaintiff contends that "physical loss" does not require a physical alteration to the physical structure of the property, but instead also includes coverage for the "tangible deprivation, loss of possession, and inability to utilize its physical property for the income-generating purposes for which the property was insured." (Doc 28, p. 10). Plaintiff reasons that physical loss and physical damage cannot be equated and that to do so would render the policy terms superfluous. (Doc. 28, p. 16). In sum, Plaintiff argues that the policy language provides coverage for its income losses because the losses resulted from the dispossession of Plaintiff's property due to the COVID-19 pandemic and resulting civil authority orders.

In support of its position, Plaintiff relies on *North State Deli, LLC v. The Cincinnati Ins. Co.*, No. 20-CVS-02569, 2020 WL 6281507 (N.C. Super. Oct. 9, 2020). In *North State Deli*, the North Carolina Superior Court held that "'direct physical loss' include[d] the loss of use or access to covered property even where that property ha[d] not been structurally altered." *Id.* at *3. *See also Studio 417, Inc. v. The Cincinnati Ins. Co.*, 478  F. Supp. 3d 794, 802 (W.D. Mo. 2020)(denying motion to dismiss because the plaintiffs "have plausibly

---

No. 20 C 3169, 2021 WL 1208969 (N.D. Ill. Mar. 31, 2021); *Melcorp, Inc. v. West Am. Ins. Co.*, No. 20 C 4839, 2021 WL 2853371 (N.D. Ill. July 8, 2021); *CFIT Holding Corp. v. Twin City Fire Ins. Co.*, No. 20 C 3453, 2021 WL 2853376 (N.D. Ill. July 8, 2021); *Cozzini Bros., Inc. v. The Cincinnati Ins. Co., Inc.*, No. 20-cv-04274, 2021 WL 3408499 (N.D. Ill. Aug. 4, 2021); *Park Place Hospitality, LLC v. Continental Ins. Co.*, No. 20 C 6403, 2021 WL 3549770 (N.D. Ill. Aug. 10, 2021).

[2]     *See, e.g., Oral Surgeons, P.C. v. The Cincinnati Ins. Co.*, 2 F.4th 1141, 1145 (8th Cir. 2021)(rejecting the plaintiff's argument that the lost business income and extra expense it incurred as a result of the suspension of non-emergency dental procedures due to COVID-19 were caused by a direct loss to property).

alleged that COVID-19 particles attached to and damaged their property *which made their premises unsafe and unusable*.") (emphasis added). Other federal district courts in Illinois have likewise ruled in favor of coverage, but such decisions are in the minority.[3]

A plain language reading of the policy, however, appears to belie Plaintiff's interpretation that it can recover for loss of use or access to covered property. For such an interpretation to work, the language should read loss "of property," but the relevant and salient language throughout the policy is "loss to" property. One federal court noted this key distinction when it held that the "policy's use of 'loss to' versus 'loss of' phrasing supports th[e] conclusion" that "loss of use of property without any physical change to that property cannot constitute direct physical loss or damage to the property." *T&E Chicago, LLD v. Cincinnati Ins. Co.*, No. 20 C 4001, 2020 WL6801845, at *5 (N.D. Ill. Nov. 19, 2020). Moreover, the type of coverage Plaintiff seeks appears to be excluded in that the policy unequivocally states that it "will not pay for 'loss' caused by or resulting from . . . [d]elay, loss of use or loss of market." (Doc. 1-1, p. 75).

This plain language reading is further supported by the "period of restoration" provision in the Business Income and Extra Expense coverage sections. The policy defines "period of restoration" in relevant part as the period of time that "[e]nds on the earlier of: (1) the date when the property at the 'premises' should be repaired, rebuilt or replaced . . . or (2) The date when business is resumed at a new permanent location." (Doc. 1-1 at p.

---

[3]     *See In re: Society Ins. Co. Covid-19 Bus. Interruption Protect. Ins. Litigation*, No. MDL No. 2964, 2021 WL 679109 (N.D. Ill. Feb. 22, 2021); *Derek Scott Williams PLLC v. The Cincinnati Ins. Co.*, No. 20 C 2806, 2021 WL 767617 (N.D. Ill. Feb. 28, 2021); *Treo Salon, Inc. v. West Bend Mutual Ins. Co.*, No. 20-cv-1155-SPM, 2021 WL 1854568 (S.D. Ill. May 10, 2021).

105-106). Without underlying physical loss or damage to the insured's property, no repair, rebuilding, replacement, or permanent location would outwardly be required, rendering this definition unclear at best. *Accord T & E Chi. LLC v. Cincinnati Ins. Co.*, 501 F. Supp. 3d 647, 652 (N.D. Ill. 2020)(noting that the definition of "period of restoration" necessarily "implies a requirement of loss to property rather than loss of property").

On the other hand, Defendants seem to narrow the concept of direct loss too far in the other direction by arguing that there must be some type of physical alteration to the property to warrant coverage. Plaintiff, for example, points to asbestos and noxious gas contamination cases, as well as falling rock cases, where Illinois state and federal courts have found coverage. In those situations, there is arguably no physical alteration to the property, but the insured clearly suffers from the loss of use or access to the property.

Both parties agree that there is no binding authority in the State of Illinois or in the Seventh Circuit finding that COVID-19 results in direct physical loss to property. The Court is therefore tasked with predicting how the Illinois Supreme Court would rule in this matter. The parties seem to place an undue emphasis on the interpretation of the terms "loss" and "damage." However, the key term in the construction of the policy is the word "physical," as it modifies both loss and damage.

While it is true that there is no binding authority on this issue, the Illinois Supreme Court has interpreted the term "physical" in an insurance policy dealing with physical injury to tangible property. *See Traveler's Ins. Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278 (Ill. 2001). In *Travelers*, the Illinois Supreme Court addressed the interpretation of a "property damage" provision in a Comprehensive General Liability ("CGL") policy as it

related to the installation of a defective plumbing system which had a propensity to leak. *Id.* at 290-291. As a result of the installation, a homeowner was exposed to a 5% risk that the system would fail in the future. *Id.* at 313. Illinois law governed the policy at issue, and the operative language defined "property damage" as "physical injury to tangible property which occurs during the policy period." *Id.* at 298. The insurers argued that "property damage" did not occur until the system actually failed, leaked, and caused water damage to the claimant's property. *Id.* at 291. The policyholders, on the other hand, argued that homes which contained the defective plumbing system did, in fact, suffer injury because of the system's propensity to leak. *Id.* at 299.

The Illinois Supreme Court found for the insurers, holding that the installation of the defective plumbing system did not cause "physical injury to tangible property." *Traveler's*, 197 Ill. 2d at 301. In arriving at its holding, the Court relied on the word "physical," which it defined as "'of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary:  Material, Natural.'" *Id.* (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1706 (1993)). The Court went on to conclude that an average, ordinary person would interpret "physical" injury to property as occurring when such property "is altered in appearance, shape, color or in other material dimension." *Id.* The Court acknowledged that something physical happened to the property when the system was installed, but it was not an injury. *Id.* at 304. The Court further determined that a "physical" injury does not take place when there is only "an economic injury." *Id.* at 308. Finally, the Court found that the purpose of a CGL policy was to protect the insured from liability for injury or damage to the persons or property

of others and that finding coverage for economic losses would transform the policy into something different. *Id.* at 314 As such, the Court held that the policyholders could not recover for the diminution of value caused by the expected failure of the system to function as promised.  *Id.* at 301-302.

Clearly, *Travelers* is distinguishable and cannot be directly applied to the construction of the relevant policy provisions in the instant case.  The most obvious point of distinction is that the policy language is different. Here, the relevant language is "direct physical loss or damage to property," whereas in *Travelers*, the relevant language was "property damage," which was defined as "physical injury to tangible property."

The use of the word "tangible" in the policy's definition is yet another point of distinction and also appeared to be critical to the holding of the case. Because the relevant policy language here does not incorporate the term "tangible," physical loss or damage to property may be intangible. *See, e.g., Newman Myers Kreines Gross Harris, P.C. v. Great Northern Ins. Co.*, 17 F. Supp. 3d 323, 330 (S.D.N.Y. 2014)(noting that the policy term "requiring 'physical loss or damage,' does not require that the physical loss or damage be tangible, structural or even visible."). This is the point Plaintiff is clearly trying to make through its reliance on cases dealing with asbestos and noxious gas contamination, as well as falling rock.

*Travelers*, however, provides an important guidepost for the Court because of its analysis of the term "physical." In *Travelers*, the Illinois Supreme Court was careful to make sure that its interpretation did not read the term "physical" out of the policy. In fact, the Illinois Supreme Court criticized the Seventh Circuit for doing just that in *Eljer*

*Manufacturing Inc. v. Liberty Mutual Ins. Co.*, 972 F.2d 805 (7th Cir. 1993). In *Eljer*, a divided panel of the Seventh Circuit concluded that under Illinois law "physical injury to tangible property occurred" when the defective plumbing system was installed. *Traveler's*, 197 Ill. 2d at 302. The Seventh Circuit concluded the covered property did not have to be injured in a "physical" sense; rather, the "physical" component was satisfied through any loss resulting from physical contact or linkage with the defective plumbing system. *Id.* at 303. The Illinois Supreme Court, however, ruled "that *Eljer* was incorrectly decided under Illinois law." *Id.* at 303. The Illinois Supreme Court reasoned that the Seventh Circuit deviated from fundamental rules of construction and failed to interpret the term "physical injury" consistently with what that term was meant to do in a CGL policy. *Id.*

The Court is tasked with interpreting and applying Illinois law and predicting what the Illinois Supreme Court would do with this case. As such, the Court must take its guidance from *Travelers* and its definition of the word "physical." The Court must thus determine whether COVID-19 constitutes "direct physical loss to property" much like the Illinois Supreme Court in *Travelers* was charged with determining whether the installation of a defective plumbing system amounted to "physical injury" within the meaning of the policy. In doing so, the Court must also be careful not to read the term "physical" out of the policy. Its interpretation must further comport with the purpose that the phrase "direct physical loss to property" is meant to serve in the policy at issue.

Here, the Court predicts that the Illinois Supreme Court would find the policy language in the instant case to be unambiguous. Contrary to Defendants' position, physical loss to property is not limited to tangible, physical alterations to the structure of

the property, but can also include intangible elements as well. The weakness of Defendants' position is that it does not account for the falling rock, asbestos and noxious gas cases cited by the Plaintiff where the courts found coverage for loss of use or access. However, Plaintiff cannot recover for loss of use or access to its property because of COVID-19. Relying on the definition of "physical" used in *Travelers*, there must be some material change or alteration to the property or premises in order to constitute physical loss to property. The presence of COVID-19 on the premises does not constitute a material change or alteration to the property or premises. Therefore, the Court concludes that there is no coverage.

The Illinois Supreme Court's definition of the term "physical" requires the property or premises to undergo some "alteration in appearance, shape, color or in other material dimension." *Traveler's*, 197 Ill. 2d at 301. *See also Windridge of Naperville Condominium Assoc.*, 932 F.3d 1035, 1040 n.4 (7th Cir. 2019). The key terms to take from this definition are "an alteration" and "in other material dimension." The term alteration suggests that, to some extent, the injury in question has transformed the property such that the property cannot be un-intertwined with the injury without either significant time or purposeful action to undo the injury. *See, e.g.*, "Alter," CAMBRIDGE BUSINESS ENGLISH DICTIONARY (2021), https://dictionary.cambridge.org/dictionary/english/alter (defining "alter" as a verb meaning "to change the appearance, character, or structure of something . . ."). The changes which result in alteration are intertwined with the property which is altered.

Equally, the term "material dimensions" connotes more than merely tangible property; it also implies the intangible, but physical, elements of the property which makes the property more than the sum of its parts. *See, e.g.*, "Material, entry 2(1)(a)(1)-(2)", MERRIAM-WEBSTER DICTIONARY (2021), https://www.merriam-webster.com/dictionary/material (defining "material" as "the elements, constituents, or substances of which something is composed or can be made" and "matter that has qualities which give it individuality and by which it may be categorized"). Together, these terms include damage or loss to property which is either tangible or intangible, so long as that damage or loss is *to* the property, *i.e.*, injury which is intertwined with the property after it occurs. These terms exclude *effects* of an injury, *i.e.*, damage or loss which is part of a chain reaction initiated by the injury in question.

In order to illustrate how the terms "alter" and "material dimensions" interact with the phrase "loss or damage to property," the Court has constructed a modified Square of Opposition (the "Square"). The Square contains four complimentary and contradictory sections:

| Intertwined and Tangible | Not Intertwined, but Tangible |
|---|---|
| Intertwined, but Intangible | Not Intertwined and Intangible |

The diagonal of the Square is contradictory, while the sections of the Square which are next to each other are complimentary. By analyzing which sections of the Square are included in the term "direct physical loss or damage," the Court can also determine which sections of the Square are excluded, and what separates those sections from the others. The Court includes both the terms "tangible" and "intangible" because Illinois jurisprudence has found coverage for physical loss or damage to property in both circumstances. The Court includes the term "intertwined" to ensure that it does not read the word "physical" out of the relevant policy provision, which is "loss or damage to property."

First, "direct physical loss or damage" clearly includes an injury which is both intertwined with the property and is tangible. For example, in *Advance Cable*, the Seventh Circuit held that, under Wisconsin law, the phrase "direct physical loss" includes both hail damage that diminished the functionality of the insured's roof and hail dents that were only cosmetic. *Advance Cable Co., LLC v. Cincinnati Ins. Co.*, 788 F.3d 743, 747 (7th Cir. 2015). The hailstorm "caused visible indentions to the surface of the roof" and "change[d] the physical characteristics of the roof." *Id*. This damage was intertwined with the property and thus was not intangible. Therefore, the policy's "direct physical loss" language was satisfied. *Id*. Thus, the term "direct physical loss or damage to property" includes the first section of the Square.

| Intertwined and Tangible<br><br>*Cosmetic and functional damage to a car roof*<br><br>*from a hailstorm* | Not Intertwined, but Tangible |
|---|---|
| **Intertwined, but Intangible** | **Not Intertwined and Intangible** |

Second, courts within the Seventh Circuit have acknowledged that certain intangible damage may be included in the phrase "direct physical loss" when the property's "function [is] severely impaired or destroyed and the property [is] rendered useless" by the alleged injury. *See Byberry Services and Solutions, LLC v. Mt. Hawley Insurance Co.*, Case No. 20-cv-03379, 2021 WL 3033612, at *5 (N.D. Ill. Jul. 19, 2021)(quoting *Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997)). *See also U.S. Fidelity & Guar. Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 931 (Ill. 1991)(listing cases)(noting that the essence of asbestos allegations is that "the buildings have been contaminated by asbestos to the point where corrective action . . . must be taken"). For instance, asbestos arguably does not cause "tangible" loss or damage to property; however, asbestos fibers are intertwined with the air inside the property such that the building is rendered useless without significant effort to untangle the property from the injury. This typically requires removing the asbestos from the property. *See Byberry Services and Solutions, LLC*, 2021 WL 3033612, at *5. The same can also be said of the noxious gas contamination cases, where the dangerous gas or fumes are intertwined

with the air. Thus, the complimentary box of "Intertwined, but Intangible" in the Square is also covered under "direct physical loss or damage to property."

| Intertwined and Tangible  *Cosmetic and functional damage to a car roof from a hailstorm* | Not Intertwined, but Tangible |
|---|---|
| Intertwined, but Intangible  *The release of asbestos fibers; noxious gas or fumes* | Not Intertwined and Intangible |

The next section of the Square which is complimentary to "Intertwined and Tangible" is "Not Intertwined, but Tangible." Courts in this Circuit have found that this type of damage is also covered under "direct physical damage." For example, in *One Place Condominium, LLC v. Travelers Property Cas. Co. of America*, the Northern District of Illinois noted that the threat of falling rocks constituted physical damage to property in the path of the potential rockfall. No. 11 C 2520, 2014 WL 4977331, at *14 (N.D. Ill. Oct. 6, 2014). Erosion and negligent construction of a nearby highwall contributed to the rockfall threat; neither cause was inherent to nor intertwined with the property, as both could be remedied. *Id*. However, the threat of loss, injury, or damage was to the tangible structure

of the property.[4] Accordingly, the third section of the Square is also covered under "direct physical loss or damage to property."

| Intertwined and Tangible | Not Intertwined, but Tangible |
|---|---|
| *Cosmetic and functional damage to a car roof from a hailstorm* | *The threat of falling rocks due to negligent construction of a nearby highwall* |
| **Intertwined, but Intangible** | **Not Intertwined and Intangible** |
| *The release of asbestos fibers; noxious gas or fumes* | |

The last section of the Square is the section contradictory to "Intertwined and Tangible," *i.e.*, "Not Intertwined and Intangible." Courts interpreting Illinois law in the Seventh Circuit have consistently held that damage or loss to property which is neither intertwined with the property nor tangible is *not* covered under the term "direct physical loss or damage." In *Chief of Staff, LLC v. Hiscox Ins. Co., Inc.*, No. 20 C 3169, 2021 WL 1208969, at *3 (N.D. Ill. Mar. 31, 2021), the Northern District of Illinois provides a helpful example in determining why the last section of the Square is not included in "direct physical loss or damage to property." When a thief steals a desktop computer, the damage or loss is intertwined with the property (*e.g.*, the nature of the property has changed from "in its owner's possession" to "not in its owner's possession[]"), and this

---

[4]     Though the damage had not yet occurred in *One Place Condominium, LLC*, the threat of damage was all but certain and thus was arguably treated as tangible damage. 2014 WL 4977331, at *13-14. This certainty was sufficient for coverage.

change cannot be undone without significant effort to catch the thief and track down the computer. *See id.* However, the damage or loss is not tangible because the computer itself has not changed. *See id.* Nevertheless, this constitutes "direct physical loss" of the computer. *Id.*

Similarly, a thief who destroys the computer with a hammer because he cannot carry it out of the premises has caused the computer damage which is both intertwined and tangible. *See id.* This is also an example of "direct physical damage." *Id.* In contrast, however, when the thief merely changes the password on the computer, rendering it inoperable, the injury is neither "direct physical damage" nor "direct physical loss." *Id.* This scenario illustrates damage which is neither tangible nor intertwined with the property. The computer itself has not been changed by the action, and the damage may be easily remedied with a call to the IT department. This damage is therefore not covered under the policy language. Accordingly, when completed, the Square looks like this:

| **Intertwined and Tangible** *Cosmetic and functional damage to a car roof from a hailstorm* | **Not Intertwined, but Tangible** *The threat of falling rocks due to negligent construction of a nearby highwall* |
|---|---|
| **Intertwined, but Intangible** *The release of asbestos fibers; noxious gas or fumes* | **Not Intertwined and Intangible** *A thief changes a computer's password* |

The Square therefore illustrates that the operative elements of "direct physical loss or damage" are that the injury must be tangible, intertwined with the property, or both. "Direct physical loss or damage" does not include the contradictory scenario, in which the damage is neither intertwined with the injured property nor tangible. Damage resulting from COVID-19 falls squarely within this section of the Square. Though the virus may be physically *present* in the air inside of or on the surfaces of items within the property in question, it does not alter, transform or change the property, air, or any of the items. *See L & J Mattson's Co. v. Cincinnati Ins. Co., Inc.*, No. 20 C 7784, 2021 WL 1688153, at *5 (N.D. Ill. Apr. 29, 2021). This is in contrast to asbestos fibers and noxious gases or fumes, which alter or transform the air in the property. In that sense, there is physical loss of the air at the property because the air transforms from being safe to breathe to not being safe to breathe. Air that contains COVID-19, however, is not inherently unsafe to breathe. For example, one can continue to breathe such air with a mask. COVID-19 thus does not cause damage or loss to the air. Any areas or items infected with the virus also do not require repair or replacement; instead, the property owner can clean the infected surfaces and wait until the virus dies. *Id*. COVID-19 is thus not intertwined with the property.

Equally, the loss or damage to the property resulting from COVID-19 is not of a tangible nature. Though the virus may cause injury to humans, it does not alter a "material dimension" of the property through its presence. *See Chief of Staff LLC*, 2021 WL 1208969, at *4 (listing cases). Unlike the threat of falling rocks, which would alter some physical aspect of the property by crashing into it, no "material dimension" is altered by

the presence of COVID-19. COVID-19 is thus neither tangible nor intertwined with the property.

The Square also illustrates why there was no coverage in *Travelers* for the installation of the defective plumbing system. Because the system in question was expected to fail in 5% of the homes, the threat of failure was not deemed imminent, as it was in *One Place Condominium*. Therefore, any damage posed by the plumbing system's potential to fail was not tangible.  It was also not intertwined because the system had not yet leaked. Had it leaked, it would have altered and/or transformed the property in question thus making the injury intertwined. Thus, *Travelers* is a situation where the injury, loss or damage was not intertwined and not tangible. As such, there was no coverage.

The Court's final Square illustrates all of the examples discussed to this point:

| Intertwined and Tangible | Not Intertwined, but Tangible |
|---|---|
| *Cosmetic and functional damage to a car roof from a hailstorm* | *The threat of falling rocks due to negligent construction of a nearby highwall* |
| **Intertwined, but Intangible** | **Not Intertwined and Intangible** |
| *The release of asbestos fibers; noxious gas or fumes* | *(i)    A thief changes a computer's password* |

| | |
|---|---|
| | *(ii)   The presence of the COVID-19 virus on surfaces or in the air inside a property* |
| | *(iii)   Installation of defective plumbing system that had not failed* |

The Illinois Supreme Court in *Travelers* has provided a straightforward path for interpreting the key policy language of "direct physical loss or damage to property." Based on the definition of "physical" in *Travelers*, there must be some injury, loss or damage to the property that is so intertwined with the property that it alters, transforms or changes the property in question. If that circumstance exists, then the injury, loss or damage can either be tangible or intangible. The intertwining of the injury, loss or damage with the property satisfies the "physical" element required by the policy. Coverage also exists if the injury, loss or damage to the property is not intertwined with the property so long as the injury, loss or damage has a tangible and imminent element to it, *i.e.*, the falling rock which threatens the destruction of the property. This tangible element likewise satisfies the "physical" element of the policy because the tangible nature of the injury, loss or damage is readily perceivable. Thus, there is no question that it equates to being "physical."

The Court's construction is also consistent with the Illinois Supreme Court's admonition to "construe the policy as a whole and 'take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract.'"

*Windridge*, 932 F.3d at 1039 (citing *Traveler's Ins. Co. v. Eljer Mfg.*, 197 Ill. 2d 278, 757 N.E.2d 481, 258 Ill. Dec. 792 (Ill. 2001)). The policy in question is a CGL policy, and as the Illinois Supreme Court noted, such a policy is designed "to protect the insured from liability for injury or damage to the persons or property of others." *Travelers*, 197 Ill. 2d at 314. This is precisely why coverage is only provided for direct loss or damage that has a physical aspect to it. It is not designed to provide coverage for economic injury resulting from the loss of use or access to property. In fact, the policy specifically notes that the Defendant "will not pay for 'loss' caused by or resulting from . . . [d]elay, loss of use or loss of market." (Doc. 1-1, p. 75). The Court's construction of the policy is thus consistent with the policy as a whole, the type of insurance purchased and the overall purpose of the contract. Because COVID-19 does not cause "direct physical loss" to property, there is no coverage under the policy, and Plaintiff's claim must be dismissed.

### B.    Civil Authority Provision

Plaintiff's claim for coverage under the Civil Authority provision fares no better. The Civil Authority provision provides for the payment of lost business income and necessary extra expenses incurred as a result of a civil authority's action, which prohibits access to the insured premises because of loss or damage to other nearby property. (Doc. 1-1, p. 86). By its plain language, the Civil Authority coverage applies only if there is a Covered Cause of Loss, *i.e.*, risks of direct physical loss or damage to property, other than at the "premises." *Id.* Just as COVID-19 did not cause direct physical loss to Plaintiff's property, Plaintiff fails to allege that COVID-19 caused direct physical loss or damage to other property. Therefore, by the policy's own terms, the Civil Authority provision does

not apply.

Even if the Court were to adopt Plaintiff's interpretation of direct physical loss to property, Plaintiff has failed to plead the necessary preconditions to trigger coverage. Two conditions must be satisfied. First, the civil authority must prohibit access to the area immediately surrounding the damaged property. (Doc. 1-1, p. 86). Second, the civil authority's action must be "in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage." *Id.*

With respect to the first condition, Plaintiff alleges that a civil authority, namely the Governor, prohibited access to the area immediately surrounding its property due to the presence of COVID-19 on property close to Plaintiff's property. (Doc. 1-1, ¶ 73). Plaintiff further alleges that another civil authority, namely, the Illinois Department of Public Health, prohibited access to Plaintiff's property for non-emergency, routine care. *Id.* Cases interpreting similar provisions have applied it strictly, requiring the civil authority to restrict access specifically to the property in question. For example, in *Syufy Enterprises v. Home Ins. Co. of Indiana*, No. 94-0756-FMS, 1995 WL 129229 (C.D. Cal. Mar. 21, 1995), the Court denied coverage under a civil authority provision. *Id.* at *2. The civil authority imposed a dawn-to-dusk curfew to reduce the possibility of rioting and looting, which had the practical effect of prohibiting people from entering the property. *Id.* However, because access to the property in question was not specifically denied, civil authority coverage was never implicated. *Id. See also The Philadelphia Parking Authority v. Federal Ins. Co.*, 385 F. Supp. 2d 280, 289 (S.D.N.Y. 2005)(holding that an FAA order aimed at aircraft operators, which effectively prevented the ingress and egress of passengers at

the Philadelphia International Airport and its parking facilities, did not trigger civil authority coverage because it did not specifically prohibit access to Plaintiff's garage and parking facilities). Here, Plaintiff cannot allege that access to its property or to the surrounding area was prohibited. In fact, Plaintiff concedes that it saw a handful of patients for urgent and emergency matters during the time that it was forced to suspend its practice. (Doc. 1-1, ¶¶ 8, 49). Thus, based on Plaintiff's own allegations, access to its property or the surrounding area was not prohibited.

Plaintiff also fails to satisfy the second precondition. The civil authority's action must be a response to dangerous physical conditions at a property near Plaintiff's property, and Plaintiff has failed to allege facts to satisfy this condition. The Court finds Judge Feinerman's reasoning in *CFIT Holding Corp. v. Twin City Fire Ins. Co.*, No. 20 C 3453, 2021 WL 2853376 (N.D. Ill. July 8, 2021) to be persuasive. In *CFIT Holding*, the Court denied civil authority coverage because the COVID-19 closure orders were in response to the pandemic in general and not because of COVID-19 contamination at a nearby property. *Id.* at *6. The Court reasoned that the closure orders were not a reaction to the presence of COVID-19 at any particular location; rather, such orders were designed to "implement[] prophylactic measures in light of the pandemic as a whole." *Id. See also Henry's Louisiana Grill, Inc. v. Allied Ins. Co. of America*, 495 F. Supp. 3d 1289, 1297 (N.D. Ga. 2020)(denying civil authority coverage because plaintiff, *inter alia*, failed to identify any particular property that was damaged by COVID-19).

Here, Plaintiff argues that this condition is satisfied through governmental orders which required dentistry practices to cease all non-emergency procedures and

individuals to stay at home unless performing essential activities. (Doc. 28, p. 19). But, the orders must be issued because of damage to other property, *i.e.*, COVID-19 contamination at that other property. It is clear from Plaintiff's own allegations that the guidance it received to suspend its practice was not because of the existence of COVID-19 at any particular property; rather, such guidance was designed to curb the spread and risk of infection. *See, e.g.*, (Doc. 1-1, ¶ 33)(noting that recommendation of state-ADA affiliate to close dental offices was because dentists were in "one of the highest risk categories for transmission and contraction of the virus, . . . ."); ¶ 34 (noting that reason for guidance to postpone elective procedures was the "risk of spread to dental office staff and patients."); ¶ 37 (explaining that CDC "recommendations were based on the risk of infection in dental offices, especially because of the splatter of bodily fluids and microorganisms). As such, the second precondition is not satisfied, which is fatal to Plaintiff's claims for coverage under the Civil Authority provision.

## II.  Plaintiff's Class Action Complaint and the *Twombly* Pleading Standard

Defendants contend that Plaintiff has made speculative and conclusory allegations of physical loss to the property and that such allegations are not adequate under the *Twombly* pleading standard. (Doc. 8, p. 7-8). Under Federal Rule of Civil Procedure 8, the Court accepts as true all well-pleaded facts in the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009). *See also O'Brien v. Village of Lincolnshire*, 955 F.3d 616, 621 (7th Cir. 2020) (internal citations omitted). However, the Court is not required to accept the allegations of "a plaintiff armed with nothing more than conclusions." *Ashcroft*, 556 U.S. at 679. The plaintiff's allegations of fact must rise above a speculative level in order to

constitute a "showing" that pushes the claims in the complaint from possible to plausible. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).

"Well-pleaded facts" include neither legal conclusions nor unsupported conclusions of fact. *See Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002) (internal citations omitted). Unsupported conclusions of fact are those which require subjective characterizations in order to verify. *See Hilliard v. City of Venice, Illinois*, Case No. 19-cv-00229-JPG, 2020 WL 7645512, *3 (S.D. Ill. Dec. 22, 2020). For instance, in *Hilliard*, the plaintiff alleged both that the defendant "did not properly ensure" that the decedent "was safe in his cell" and that the defendant "failed to appropriately monitor" the decedent. *Id*. While neither claim was a direct legal conclusion, both allegations required the Court to determine the subjective meaning of the terms "proper" and "appropriate." *Id*. These statements were therefore insufficient to survive a motion to dismiss. *Id*.

This analysis applies with equal force to conclusions of fact premised on a faulty assumption. *See Watters v. Harris*, 656 F.2d 234, 238 (7th Cir. 1980), overruled on other grounds by, *Boley v. Colvin*, 761 F.3d 803 (7th Cir. 2014). In *Watters*, the plaintiff initially failed to meet the six-month deadline to request a hearing on the merits of her social security case. *Id*. She then requested a hearing on the issue of whether there was good cause to excuse her untimeliness, which the Social Security Administration denied. *Id*. When requesting leave to amend her complaint in district court in response to a motion to dismiss, the plaintiff alleged that the Administrative Law Judge's decision to deny a hearing on the issue of good cause reflected an admission by the Social Security Administration that good cause existed for her untimeliness. *Id*. The Seventh Circuit

upheld the district court's decision denying leave to amend and granted the motion to dismiss. Because the primary assumption on which the plaintiff predicated her argument was faulty, her conclusory statement of fact could not overcome a motion to dismiss. *Id.* at 240.

In the same vein as the cases above, Plaintiff's Class Action Complaint suffers from a faulty assumption, *i.e.*, the presence of COVID-19 on its premises has caused direct physical loss. It is true that Plaintiff alleges it suffered direct physical loss because of its inability to use the property for orthodontic treatment. (Doc. 1-1, ¶ 80). However, Plaintiff also alleges that the presence of COVID-19 in property other than the Plaintiff's property has caused direct damage to that property entitling it to Civil Authority coverage. *Id.* at ¶ 73. Implicit in that allegation is that COVID-19 is also present on its premises and has likewise caused damage or loss to its own property. Indeed, Plaintiff alleges general facts about COVID-19 and various local, state, and national statistics regarding COVID-19 infections. *Id.* at ¶¶ 18-30. Plaintiff further alleges guidance that it received from various entities regarding the suspension of most dental procedures. *Id.* at ¶¶ 31-47. All of these allegations are presumably made with the purpose of demonstrating that COVID-19 is present on its premises and has caused damage or loss to that premises. However, Plaintiff fails to allege that COVID-19 was or has ever been on its property.

Plaintiff wrongfully assumes that COVID-19 was present on its premises and has caused the premises damage or loss. Making that assumption would amount to nothing more than mere speculation. Had Plaintiff alleged that a patient or employee tested positive for COVID-19, there arguably would have been a basis to conclude that COVID-

19 was on the premises. *But see Torgerson Properties, Inc. v. Continental Casualty Co.*, 520 F. Supp. 3d 1155, 1158 (D. Minn. 2021)(noting that the plaintiff's broad statements that it believed that one employee and one visitor had tested positive for the virus were "insufficient . . . to give rise to a claim for 'direct physical loss' under the policy."). Without any such allegation, the Court is left to conclude that COVID-19 was at the insured premises based solely on the general facts and statistics about COVID-19 alleged in the Class Action Complaint. This is clearly insufficient to satisfy the *Twombly* pleading standard, and as such, Plaintiff's Class Action Complaint must be dismissed on this basis as well.

## III.     Breach of Contract and Bad Faith Denial of Insurance Claims

Plaintiff also alleges claims for Breach of Contract (Counts I, IV, VII) and Bad Faith Denial of Insurance under 215 ILL. COMP. STAT. § 5/155 (Counts II, V, VIII). (Doc. 1-1, p. 24-35). With respect to the breach of contract claims, Plaintiff alleges that by denying coverage, Defendants breached their various obligations under the policy. *Id.* at ¶¶ 101, 126, 152. However, the Court has already concluded that a proper construction of the policy does not afford Plaintiff any coverage. As such, Plaintiff's breach of contract claims must be dismissed.

As for Plaintiff's bad faith denial claims, Section 155 provides an extracontractual remedy to policyholders when an insurer's refusal to pay a claim is "vexatious and without reasonable cause." *Cramer v. Insurance Exchange Agency*, 675 N.E.2d 897, 901 (Ill. 1996). A claim under Section 155, however, can only proceed "if the insurer owed the insured benefits under the terms of the policy." *First Ins. Funding Corp. v. Federal Ins. Co.*,

284 F.3d 799, 807 (7th Cir. 2002). Moreover, the statutory sanctions set forth in Section 155 are inappropriate when there is a bona fide and genuine dispute regarding coverage. *See Phillips v. Prudential Ins. Co. of America*, 714 F.3d 1017, 1023 (7th Cir. 2013). It is also appropriate to dismiss such claims at the pleading stage. *See 9557, LLC and River W. Meeting Assocs., Inc., Travelers Indem. Co. of Conn.*, No. 15-cv-10882, 2016 WL 464276, at *4 (N.D. Ill. Feb. 8, 2016). Here, such a dispute did exist, and the Court found that the policy did not provide coverage. Thus, Plaintiff's Section 155 claims fail as a matter of law and likewise must be dismissed.

## CONCLUSION

There being no coverage under the policy, the Court must dismiss Plaintiff's claims for declaratory relief relating to Business Income, Extra Expense, and Civil Authority coverage (Counts III, VI, and IX). Further, because the remaining counts are predicated on an interpretation of Defendants' policy that the Court cannot accept, the Court also dismisses Plaintiff's counts for breach of contract (Counts I, IV, VII) and damages pursuant to 215 ILL. COMP. STAT. § 5/155 (Counts II, V, VIII). The Court further finds that the failure to state a claim is not tied to a pleading deficiency that can be corrected with an amended complaint. As such, the Court will not grant leave to amend.

For the above-stated reasons, Defendants' Motion to Dismiss (Doc. 7) is **GRANTED**. Plaintiff's Complaint (1-1) is hereby **DISMISSED with prejudice**. The Clerk of the Court is directed to enter judgment accordingly and close this case.

IT IS SO ORDERED.

DATED:  September 30, 2021.

Digitally signed
by Judge Sison 2
Date: 2021.09.30
19:58:43 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**